IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JENNIFER BEARDSALL, DANIEL BROWN, JENNIFER CARLSSON, DEBORAH CARTNICK, AMY CONNOR-SLAYBAUGH, PHYLLIS CZAPSKI, RAELEE DALLACQUA, AUTUMN DEAN, SKYE DOUCETTE, CHRISTOPHER DRAUS, ALEXANDRA GROFFSKY, EMMA GROFFSKY, JOYCE IVY, LA TANYA JAMES, MICHELLE JESSOP, JOY JUDGE, KATHY MELLODY, SUSAN NAZARI, MEGAN NORSWORTHY, DEBORAH OSTRANDER, MARTINA OSLEY, DANA PHILLIPS, THOMAS RAMON, JR., NANCY REEVES, SHELLEY WAITZMAN, JAMILLA WANG, AND AMBER WIMBERLY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>CVS PHARMACY, INC., TARGET CORPORATION, WALGREEN CO., WAL-MART STORES, INC., and FRUIT OF THE EARTH, INC.,<br><br>Defendants. | Case No. 1:16-cv-06103<br><br>Hon. Joan H. Lefkow |

**PLAINTIFFS' RESPONSE TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants call Plaintiffs' claims frivolous without even citing the Seventh Circuit's controlling decision in *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014). In *Suchanek*, the Seventh Circuit reversed a grant of summary judgment, finding that the district court

1

erroneously "appear[ed] to assume that a package cannot be misleading if it does not contain literal falsehoods." But, the court held:

> *that is not the law*. . . . Our *de novo* review of the summary judgment record satisfies us that there are genuine issues of material fact in each of the individual cases whether [Defendants'] packaging was likely to mislead a reasonable consumer…. *A jury should have decided the question of whether the packaging was likely to mislead reasonable consumers*."

*Id*. at 761-63 (emphasis added).[1] Like *Suchanek*, this case involves misleading labels on several aloe gels manufactured by Defendant Fruit of the Earth, Inc. ("FOTE").[2] The labels claim that these products ("Products") contain "aloe" which helps relieve "sunburn." FOTE's label goes even further, claiming that its Product contains "Aloe Vera 100% Gel. Pure. No Color Added." This label is misleading because FOTE's Product is neither "100% aloe," nor "pure," as confirmed by multiple sources.[3] Whether these labels are likely to mislead reasonable consumers is a question for a jury to decide. *Suchanek,* 764 F.3d at 762 ("A jury should have decided the question whether the packaging was likely to mislead reasonable consumers.").

Nuclear Magnetic Resonance ("NMR") testing revealed that a key element of aloe, a polysaccharide called Acemannan, is present in these Products in only trace amounts that provide no therapeutic benefit. Defendants' expert, Dr. Ronald P. Pelley, M.D., Ph.D., conceded that *he*

---

[1] On July 10, 2017, the parties agreed to a bellwether process to focus discovery, expert, class certification, *Daubert*, and summary judgment efforts on two discrete Products: (1) FOTE's Aloe Vera 100% Gel, and (2) Well-at-Walgreens Alcohol Free Aloe Vera Body Gel. ECF No. 111. On July 11, 2017, the Court entered the parties' proposed bellwether schedule and bifurcated discovery ECF No. 112.

[2] FOTE sells its own brand of aloe gel, and also produces private-label versions for Defendants CVS, Walgreens, Walmart and Target. These Products are identical except for the wording of their labels, and the possible inclusion of alcohol and/or coloring.

[3] Copies of the labels in question are attached as Exhibits A and B.

*would not use the Products to treat sunburn*.[4] As in *Rikos v. P&G*, 799 F.3d 497, 508 (6th Cir. 2015), and *Suchanek*, *v. Sturm Foods, Inc.*, 311 F.R.D. 239, 258 (S.D. Ill. 2015) (*on remand*), these Products could be properly viewed by a jury as "snake oil" that no reasonable consumer would have purchased, entitling everyone to a refund of their purchase price.

Because a jury must decide whether Defendants' packaging would mislead reasonable consumers, Defendants' Motion for Summary Judgment must be denied.

## LEGAL STANDARD

Under Rule 56, the Court must construe the record in the light most favorable to the non-moving party; it must not weigh the evidence but only determine whether there is a genuine issue for trial. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). In consumer fraud actions, summary judgment is almost never appropriate because "a jury should … decide[] the question whether the packaging was likely to mislead reasonable consumers." *Suchanek*, 764 F.3d at 762.

## ARGUMENT

### I.  Whether the Product Labels Are Misleading Is A Jury Question

Defendants argue that their "products are made from aloe, so they are aloe gels." Defendants' Memo of Law in Support of Motion for Summary Judgment ("MSJ") 3-4, ECF No. 172. The question is whether Defendants' labels are misleading, even if the Products were "made from aloe." Under *Suchanek*, a jury *could* determine that the Products contain aloe and therefore the labels are accurate. However, a jury *could* instead agree with Plaintiffs that the labeling is likely to mislead reasonable consumers -- even though some harvested aloe was used to manufacture the

---

[4] Dr. Pelley explained that adding water to dilute the original aloe concentration results in adulterated or degraded aloe. Pelley Dep. 126:8-19 (Exhibit C).

3

Products. *See id.* at 762 (finding that a plaintiff's understanding of "soluble" did not imply that she understood the coffee was over 95% instant coffee).

More to the point, FOTE intentionally made a marketing decision to use the terms "100%" and "Pure" to describe its Product. It acknowledged that the label could be misunderstood, and *has been* misunderstood by some consumers over the years.

> "Q: Fruit of the Earth has been aware that the 100% Aloe Vera Gel label has caused its customers to believe the label is misleading, however, right?
>
> A: Well, we are aware that some consumers could see it that way; however, we call the product Aloe Vera 100% Gel. …
>
> Q: … And since at least 2008, Fruit of the Earth customers have found those words to be confusing, haven't they?
>
> A: There have been very few complaints [or] comments regarding that."

Heurta Dep. 18:16-22, (Exhibit D).[5]

More importantly, these Products are specifically marketed for the treatment of "sunburn." An aloe gel or any other product that contains only *de minimus* amounts of the necessary compounds for sunburn relief should not be marketed and labeled for that purpose. Defendants' own expert confirms the labels are both misleading and fraudulent. Pelley Dep. 126:8-19.

---

[5] Mr. Huerta also admitted that the Products contain approximately 98% aloe gel (which itself is 99% water), and 2% other ingredients including thickeners, stabilizers and preservatives, *id*. 82:23-89:16, and that "[t]he product is never meant to state -- or doesn't state 100% aloe vera, so that was never our intent to state that." *Id*. 46:4-6. While FOTE might not understand its label is misleading, *id*., 58:15-19 ("This product has been on the stores' shelves for close to 30 years and it sells great."), Walgreens tellingly chose *not* to use the "100%" descriptor on its label for the identical product. *Id*., 69:7-12, 72:22-23 ("[T]hey chose not to use 100%, that was their direction to us."). Equally compelling is the fact that the label on the identical Target Product was recently changed to read "97.7% pure aloe vera gel." A photograph of that label is included in the Second Amended Complaint ¶ 90, ECF No. 90.

4

Defendants criticize Plaintiffs' expert Dr. John Edwards' reliance on the NMR test (that showed only trace amounts of Acemannan is present in the Products) because it has never been used for thickened/processed cosmetics. But Defendants offer nothing in response to demonstrate that their Products actually help relieve sunburn. This conspicuous absence of contradictory proof inarguably weighs against summary disposition of this action.

A. **Defendants Use of Harvested Aloe Is Not Relevant to the Key Issue That Must Be Decided**

All experts in this case agree that Acemannan is the one compound in aloe that makes it unique, yet it makes up only about 1% of the plant. *See infra.* Native aloe gel is 99% water. Pelley, R.P., *Industrial processing and quality control of Aloe Barbadensis (Aloe vera) gel*, Medicinal and Aromatic Plants – Industrial Profiles, CRC Press, Vol. 38, 265-310 (2004), at 39 (Exhibit E).[6] Therefore, it is critically important to source a high quality aloe feedstock in order to preserve aloe's therapeutic benefits. Pelley, R.P., *Multiparameter Analysis of Commercial "Aloe Vera" Materials and Comparison to Aloe Barbadensis Miller Extracts*, Subtropical Plant Science, Vol. 50, 1-14, at 13 (1998) (Exhibit F) ("[I]t is highly likely that approximately 75% of all material vended as 'Aloe Vera' is devoid of at least that [therapeutic] biological activity"). However, even the owner of FOTE's supplier – Timothy Meadows, of Concentrated Aloe Corporation ("CAC") – expressed concern over the quality of the raw aloe material he supplies to FOTE. Meadows Dep.

---

[6] Dr. Pelley, through his affiliations with the International Aloe Science Council ("IASC") and the Aloe Research Foundation ("ARF"), has been an outspoken advocate for better testing and quality control in the aloe industry. His research in 1998, for example, showed that "seventy-one percent of [aloe] suppliers were vending material that was not consistent with what it was claimed to be – pure *Aloe Barbadensis* extract." Pelley, R.P., *Multiparameter Analysis of Commercial "Aloe Vera" Materials and Comparison to Aloe Barbadensis Miller Extracts*, Subtropical Plant Science, Vol. 50, 1-14, at 13 (1998) (Exhibit F).

5

72:21-75:25, (Exhibit G) ("The Acemannan was low but it was there.").[7] Commercial processing like that which the CAC material undergoes, including de-colorization (filtering through activated charcoal to make it clear) and dilution and rehydration (for shipping), can alter or degrade aloe to the point where it no longer has any therapeutic qualities. Pelley Dep. 117:16-122:20; *see also* Pelley, R.P., *Industrial Processing* at 40 (over-processing can result "in products that, although legally aloe and not adulterated, have lost key chemical ingredients and biological activity").[8]

Defendants' video and explanation of their processing methods only demonstrates that harvested aloe is used in the manufacturing process. They do not and cannot explain why so little Acemannan is contained in their finished Products, or how a Product that does not contain more than trace amounts of Acemannan could possibly relieve sunburn.[9] Defendants also have no explanation for why other manufacturers are able to produce aloe aftersun products containing Acemannan, when their supplier and manufacturing process cannot.

---

[7] According to the IASC, real aloe should contain at least 5% Acemannan by dry weight. *Cf.* Pelley Dep. at 111:3-19; FOTE0002865 (Exhibit H). CAC's raw aloe gel that was tested in May 2016 contained only 20% of this amount (i.e., 1.01% dry weight.), Exhibit I, and this gel was then further diluted, augmented, and processed by FOTE before being bottled.

[8] Prior to 2010, CAC's cosmetic grade aloe gel had an Acemannan content of 7.9%, as confirmed by independent IASC tests. FOTE0002862-65; Heurta Dep. 74:5-76:8. Some of CAC's other aloe grades also currently test positive for Acemannan [Exhibit J - Feb. 7, 2016 PNMR Report 1X-CG 5.85%], as does FOTE's new "98% Pure" Aloe Vera juice. [Exhibit K - July 28, 2016 PNMR Report]. Neither Defendants, nor CAC can explain why current supplies of CAC's cosmetic grade aloe gel are testing so low, something Plaintiffs intend to explore in the merits phase of this case.

[9] Dr. Pelley attempts to characterize the Products as moisturizers rather than being for sunburn relief. Pelley Dep. 76:16-86:22, 176:21-177:4 ("Cosmetic products are not allowed to make claims for active ingredients"). To support his claim that these products do in fact moisturize, Dr. Pelley applied the gel to his skin and to the skin of defense counsel who all felt it worked. *Id.* 78:14-80:20. ("I smeared it on my skin and offered it to other counselors for them to smear on their skin to see whether, in fact, it did help dry, irritated skin."). This demonstration is the full extent of Defendants' "scientific support" for their sunburn relief claims. *Id.* at 86:19-22 (and, none of the "test subjects" even *had* a sunburn at the time).

6

The IASC and the parties' experts all agree that Acemannan is the compound in aloe that makes it unique. *See* FOTE0002862-65; Pelley Dep. at 103:21-106:22; Pelley, R.P., *MPS Aloe Mucopolysaccharides*, IASC publication: Inside Aloe (1996) (Exhibit L); Pelley, R.P., *Beneficial Effects of Aloe in Wound Healing,* Phytotherapy Research, Vol. 7, S48 (1993) (Exhibit M).[10] Defendants want to focus only on the use of harvested aloe in the manufacture of their Products, but the actual issue concerns how their manufacturing process has filtered out or removed virtually all of the Acemannan, leaving only tiny fractions of it in the finished Products.

### B.   Unclear Disclaimers and Asterisked Fine Print Can Still Mislead

Defendants assert that "[t]o the extent Plaintiffs are claiming that they thought they were buying aloe squeezed from a plant directly into a bottle, this theory cannot survive summary judgment." MSJ 6. Defendants cite "admissions" by Plaintiffs that they did *not* believe they were buying "aloe squeezed from a plant." MSJ 14. Defendants therefore ask the Court to conclude that Plaintiffs could not have been deceived into believing the Product was "Aloe Vera 100%" as represented on the label, arguing that "[n]o reasonable consumer could believe that [the Products] contain aloe and literally nothing else." *Id*.

In fact, Plaintiffs made clear that the presence of preservatives—in reasonably small amounts—was acceptable and something they *expected*. *See*, *e.g.*, Groffsky Dep. 86:22-87:18, (Exhibit N); Draus Dep. 122:13-16, 157:22-158:14, (Exhibit O); Reeves Dep. 168:6-169:4, (Exhibit P); Wang Dep. 69:1-10 (Exhibit Q). Plaintiffs never expected "aloe squeezed from a plant directly into a bottle." But neither did they expect that a Product labeled "Aloe Vera 100% Gel" could have "*little to no* aloe at all." Groffsky Dep. 40:11 (emphasis added).

---

[10] Dr. Pelley now retreats from some of the conclusions reached in his article, which is why he omitted it from his list of published research required by Rule 26(a)(2)(B)(iv). Pelley Dep. 94:3-98:19. It nevertheless remains evidence that a jury may consider.

7

The Products "contain *barely detectable* amounts of anything therapeutic, let alone the 'aloe' claimed on the labels. At these extremely low part[s]-per-million levels, with many of aloe's signature components absent, *it is misleading* to claim that Defendants' Products even contain aloe, let alone that they contain 'Aloe Vera 100% Gel.'" Motion for Class Certification at 1, ECF No. 157 (emphasis added); *see also*, *e.g.*, Groffsky Dep. 39:5-41:9, 42:25-43:6. If the label was misleading because there was less than 100% aloe in the Product, then whether the actual amount was "none" or "barely detectable" is irrelevant. As Plaintiff Nancy Reeves explained, "I'm suing because it's not a hundred percent." Reeves Dep. 70:21-25.

No Plaintiff took the label to mean that there was absolutely nothing other than aloe vera in the bottle; however, several Plaintiffs testified that the label seemed designed to mislead them into thinking that aloe vera was, at the very least, the *main* ingredient in the Product:

> A: … The aloe vera … caught my attention because it's very large letters on the bottle.

Draus Dep. 132:7-11.

> Q: Now, if we move up to the top [of the back label], there's some writing in blue. Can you read that very first line in blue for me, please?
>
> A: "100% Pure Aloe Vera Gel."
>
> Q: Is that what you understood this to be – this bottle?
>
> A: Yes.

Reeves Dep., at 195:16-25. A reasonable jury could agree that, regardless of whether the Product contains "no aloe vera" or "barely detectable" aloe, both are far from the "100%" "Pure" claims stated on the label.

    **C. The Absence of an Established Government Standard For Aloe Does Not Mean That Defendants May Misrepresent Its Content in Their Products**

8

Defendants contend that the Fair Packaging and Labeling Act *requires* them to label the Products as "aloe vera gel." MSJ 9. But, "aloe vera gel" is not recognized as a valid cosmetic ingredient by the Cosmetic, Toiletry and Fragrance Association, Inc. in the Cosmetic Ingredient Dictionary ("CID"). 21 C.F.R. § 701.3(c); Excerpt from the CID website, Exhibit R. It is simply an invented and technically meaningless term created by Defendants to help sell the challenged Products. SAC ¶ 129. Further, aloe vera (or aloe vera gel) is 99% water (which is probably why the CID and/or FDA do not consider it to be a true cosmetic ingredient). Thus, listing "aloe vera gel" as the first/predominant ingredient is not only unlawful, it is extremely misleadingly.[11]

Given these facts, no federal law or regulation compels Defendants to mislabel the Products as "aloe vera," "aloe vera gel" or "100% pure aloe vera gel," in a large, bold font on the center of the front and back Product labels.

### D. Defendants Cannot Show That Their Products Actually Work

Defendants admittedly have done no testing themselves, either prior to this case or in defense of it, that might possibly support their claims that these Products relieve sunburn. Heurta Dep. 75:14-76:8. Nonetheless, they maintain that their Products provide sunburn relief, continuing to market them on that basis. Loeding Dep. 56:8-12, (Exhibit T).[12] These claims are disingenuous and misleading on their face. *See Muir v. Playtex Products, LLC*, 983 F.Supp.2d 980, 985 (N.D.

---

[11] FOTE and Walgreens competitor, Banana Boat's popular aloe gel lists "water," several preservatives and stabilizers as the predominant ingredients in its product. (Exhibit S.)

[12] The back of FOTE's label states: "Cooling soothing gel from nature's miracle plant of the ages . . . Forms a protective barrier which helps . . . promotes healing. Non-Oily Moisturizer provides effective relief from Sunburn, Minor Burns, . . . ." Exhibit U. The back of Walgreens' labels states: "Walgreens Aloe Vera Body Gel provides powerful relief for . . . sunburned skin. This refreshing gel helps . . . promote healing by forming a protective barrier over injured skin. This . . . formula . . . helps relieve minor burns . . . .." Exhibit V.

Ill. 2013) (upholding IFCA claim because product label "'conveys a broad claim of comparative superior product efficacy' without scientific evidence establishing its truth"); *DeFalco v. Vibram USA, Inc.*, 2013 WL 1122825, *1-2 (N.D. Ill. Mar. 18, 2013) (upholding ICFA claim where Vibram claimed health benefits associated with shoes without scientific support). Indeed, the sheer number of aloe-related FDA and FTC warning letters and cease and desist orders in recent years shows how prevalent the problem of unfounded claims about the health benefits of aloe has become.[13] The jury should be allowed to consider these facts when evaluating Defendants' labels.

---

[13] The FDA issued warnings and cease and desist letters to numerous aloe companies for making unsubstantiated aloe-related health and wellness claims. The list includes: Aloe Farms, Inc. (Jul. 15, 2016) ("Aloe vera Gel … cures everything"); Aloe Man, Inc. (Jan. 8, 2015) ("Helps get rid of … inflammation"); Dandy Day Corporation (Dec. 17, 2014) ("[Aloe Vera] has been studied for its effectiveness as an: Antibacterial, Antiviral, Antifungal, anti-inflammatory"); Salud Natural Entrepreneurs, Inc. (Apr. 8, 2016) ("healing, light burns, wounds"); Chaya Herbal Food, Inc. (Dec. 9, 2015) ("Minor Burns, Cuts, Sores, Scrapes, Sun Burn, Heat Rash"); Sunset Natural Products (Mar. 19, 2013) ("[A]n excellent component in healing of wounds … it helps prevent infections"); Yusef Manufacturing Labs (May 25, 2017) ("You do not test incoming active pharmaceutical ingredients and other components used in manufacturing your SPF 15 sunscreen lip balm products for adherence to all appropriate quality attributes. Your procedures only required routine incoming component testing for color, odor, and appearance"); Be Natural Organics (Jul. 19, 2017) ("Aloe Vera Leaf Juice [(an ingredient in the product] – Research has shown aloe vera's unique ability to regenerate cellular membranes"); Finally Pure (Jul. 20, 2016) ("Organic Aloe Vera:…aids in the skin cell renewal process and collagen production … which helps to accelerate skin repair and reduce inflammation"); Skin 2 Spirit (Aug. 10, 2017) ("ORGANIC ALOE … reduce[s] inflammation and swelling. Aloe vera also reduces redness"); Skin Authority (Mar. 25, 2015) ("Aloe Barbadensis Extract – Calms inflammation with an anesthetizing response"); Aegeia Skin Care (Feb. 17, 2017) ("The many benefits of aloe vera include: soothing skin injured by burns … [and] relieving itching and swelling of irritated skin"); Ozark County Herbs (Mar. 30, 2018) ("Heals and prevents infection in minor burns, cuts and wounds"); Sarkli Repechage Ltd. (Aug. 18, 2016) ("protect the skin from UV damage"); Vital Heirbas Naturales (Marc. 30, 2018) ("contributes to overcome [sores] of ulcers and indigestion"); Get the Tea (Mar. 22, 2018) ("It is best known for treating skin injuries"); and Vibrant Life (Aug. 7, 2013) (unfounded aloe testimonials). FDA website at https://tinyurl.com/aloe-enforcement-letters (last accessed June 26, 2018); *see also* FTC press release *No Silver Lining for Marketers of Bogus Supplement; Federal Agencies Crack Down on Health Fraud* (Jun. 18, 2003) advising consumers to ask the following questions before purchasing a health-related product: "What is the evidence that this product will do whatever the product purports to do (e.g., counteract the disease or medical condition being relieved; lead to better results than conventional treatment?) … Have results from studies of this product been published in any peer-reviewed medical journals?" https://www.ftc.gov/news-

Consumer complaints received by Defendants over the last decade also demonstrate how misleading their labels are (and how longstanding the problem has been):

- Mar. 24, 2014 complaint to FOTE, titled: "100% gel is NOT 100% ALOE VERA!!!" "PLEASE STOP misleading People!!!" FOTE0003073-75 (Exhibit W).

- Mar. 17, 2014 complaint to Walgreens, titled "WALG ALOE VERA GEL CLEAR 6 OZ." "I purchased the Walgreens brand After Sun Gel with Aloe (Sensitive Skin). When I got home I was appalled to see that the 2nd ingredient in this product is denatured alcohol and aloe leaf juice powder is only the 6th ingredient! I returned it the next day and purchased a product at CVS that has aloe gel as the first ingredient…." Walgreens0000002 (Exhibit X).[14]

- Dec. 12, 2012 complaint to FOTE, titled "100% Aloe Vera gel." "I'm sure I can find a purer version of Aloe Gel – if they can do it why can't you…. It isn't pure and not 100% -- IT HAS FIVE OTHER INGREDIENTS! – and guess what 4 of them are on the Whole Foods never use list." FOTE0003065-67 (Exhibit Y).

- Dec. 5, 2011 complaint to FOTE, titled "Ingredients in Aloe 100% Gel." "[I]f a product claims to be 100% pure that usually means it has no additives or chemicals…. The label is very misleading. . . . After I got home I read the back of the label of ingredients. Why if it is 100% pure aloe vera would it have these other chemicals? … I think your company should not label this as pure." FOTE0002995-97 (Exhibit Z).

- Jul. 28, 2010 complaint to FOTE, titled: "ALOE VERA – CRYSTAL CLEAR ALOE GEL – Healing Therapy." "Your product is HORRIBLE! It says 100% pure Aloe Vera at the top in big blue letters, but, if you are smart enough to actually read the ingredients you realize it's a LIE!... I don't know what's with companies these days that make all these wild claims and use marketing ploys that are so deceptive…." FOTE0002842-43 (Exhibit AA).

- Apr. 1, 2009 complaint to FOTE, titled: "aloe vera gel." "[I]f you read all the reviews of your product, many people have a good point about your misleading 100 percent labeling. You cannot get around that even if you try. It is misleading." FOTE0002846-49 (Exhibit BB).

---

events/press-releases/2003/06/no-silver-lining-marketers-bogus-supplement-federal-agencies (last accessed June 26, 2018). https://www.ftc.gov/news-events/press-releases/2003/06/no-silver-lining-marketers-bogus-supplement-federal-agencies.

[14] That some of these products list aloe vera as the first ingredient and others do not is another fact a jury will consider in determining whether these labels are misleading.

11

- May 14, 2008 complaint to FOTE, titled: "Crystal Clear Aloe Gel." "I understand why the additives are in there. I don't understand how you can claim it's 100% pure aloe as it says on the bottle." FOTE0002866 (Exhibit CC).

And finally, a jury may accept the testimony and work of Defendants' expert, as well as that of other respected researchers including the IASC and ARF, who all conclude that without Acemannan these products have *little if any therapeutic value*. Pelley Dep. 120:22-24 ("If you destroy the polysaccharides, you're not going to be able to generate the cytoprotective oligosaccharide" that helps prevent skin cancer); 125:15-129:23 ("I certainly would not use [degraded or watered down aloe] to treat sunburn with"); Pelley, R.P., *MPS Aloe Mucopolysaccharides* at 1 ("[P]olysaccharides are integral to the chemical composition of Aloe. They are one of the truly unique things to Aloe and are important to many of the benefits of aloe").

All of the evidence described above shows that Defendants' labels have the capacity to mislead. Therefore, a jury must decide whether these labels would mislead reasonable consumers. *Suchanek,* 764 F.3d at 762.

## II. Attempted Justification of Their "100%" Label Shows That the Label Has the Capacity to Mislead

Defendants attempt to evade accountability by making it the consumers' burden to discover that the Products are, in fact, not 100% aloe as their labels attest.[15] *See Grabowski v. Dunkin' Brands, Inc.*, 2017 WL 6059966, at *1-2 (N.D. Ill. Dec. 7, 2017) (rejecting similar attempt to shift burden to consumers); *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 152 (N.D. Ill., 2017) (rejecting argument that consumers should be required to seek out small print disclaimer at the point-of-sale).

---

[15] Defendants claim without support that "[n]o *reasonable* consumer could believe that Fruit of the Earth's products contain aloe and literally nothing else because, again, reasonable consumers understand the realities of mass-produced cosmetic products." MSJ 14. In fact, the issue of whether reasonable consumers would believe the Products are 100% pure is central to this case and obviously disputed. Summary disposition is therefore inappropriate.

Usually, a consumer's product investigation is done at the point of sale in the few seconds before placing the item into their cart. This pattern of behavior explains why companies' marketing departments spend billions of dollars on persuasive labeling and marketing of consumer products. It also explains why laws, regulations and judicial opinions exist to prevent deceptive labeling. *See Pom Wonderful LLC, v. Coca-Cola Co.*, 134 S.Ct. 2228, 2233 (2014). The actual number of consumers who have been subject to and affected by deceptive labeling is not the issue. The question is whether a *reasonable person* would have been misled, and it must be decided by a jury. *Suchanek*, 764 F.3d at 762-63 (rejecting argument that testimony of any individual consumer would be dispositive).

Defendants' argument also overlooks that the term "Pure" is printed in bold letters immediately following the "100%." While both are individually inaccurate and misleading, when they are viewed together they create a strong, but false, impression in consumers. *E.g.*, Reeves Dep. at 117:25-118:7; Groffsky Dep. at 119:10-15. These misrepresentations are targeted at consumers and designed to stifle demand for competing products. A jury could find compelling the distinction between the mislabeling of Defendants' Product and more accurate labeling on competitors' products that properly describe their ingredients.

Defendants point to the ingredients lists on the back of their Products to prove that no reasonable consumer would rely on the "100%" claim in light of the non-aloe ingredients listed. But whether Defendants' ingredient lists outweigh their front label claims is a quintessential question of fact that must be decided by the jury—it is not a matter to be decided on a motion for summary judgment. *Williams v. Gerber Products Co*., 552 F.3d 934 (9th Cir. 2008) (words "fruit juice" alongside images of specific fruits could constitute false advertising, even though small-print ingredients list disclosed corn syrup and sugar as most prominent ingredients, with no juice

from depicted fruits); *Korte v. Pinnacle Foods Group, LLC*, 2018 WL 1508855, *4 (S.D. Ill. Mar. 27, 2018) ("question of fact as to whether consumers could be misled about product's quality despite ingredients list that included other, inferior oils); *Gubala v. CVS Pharmacy, Inc.*, No. 14 C 9039, 2016 WL 1019794, *11-12 (N.D. Ill. Mar. 15, 2016) (reasonable person might be misled by product name, despite list of ingredients); *Thornton v. Pinnacle Foods Group, LLC*, 2016 WL 4073713, *3 (E.D. Mo. Aug. 1, 2006) ("the effect that an ingredient statement may have on a reasonable consumer's understanding of advertising and product labels involves a factual inquiry") (citation omitted).[16]

### III. Defendants' Pleading Arguments Are No Defense

Defendants' final tactic is to try to dismiss Plaintiffs' consumer fraud claims because they are "really express warranty claims 'clothed in different garb.'" MSJ 15. However, the appropriate inquiry is not whether a contract was formed between the consumer and the merchant, but whether the alleged conduct "implicates consumer protection concerns." *Gubala*, 2016 WL 1019794 at *17; *see also Song v. PIL, L.L.C.*, 640 F. Supp. 2d 1011, 1017-18 (N.D. Ill. 2009). Here, Plaintiffs' consumer fraud claims are distinct because Defendants violated non-delegable duties requiring them to refrain from introducing misbranded products into the stream of commerce. *See Suchanek*, 764 F.3d at 761-62 ("All of the applicable consumer protection laws at issue here may be satisfied by proof that a statement is likely to mislead a reasonable consumer, even if the statement is literally true."). Defendants misled consumers about the ingredients and effectiveness of the Products, including the use of stylized pictures of the aloe vera plant to further imply the presence of aloe in the Products. SAC ¶¶ 81, 94; Loeding Dep. 76:25-78:25 ("We chose the aloe leaf because we felt that

---

[16] Defendants' ingredient list argument also fails to take into account that consumers have no way of determining that Defendants' Products contain almost no Acemannan or that Defendants have done nothing to support their claims that these Products actually help relieve sunburn.

14

it demonstrated to the customer *what the product is*.") (emphasis added). Defendants further misled consumers by placing the words "Aloe Vera," "100%," and "Pure" in close proximity on the Product labels, even though there are multiple ingredients in the Products. *E.g.,* Groffsky Dep., 144:20-145:6.

Defendants also violated the FDCA and analogous state statutes, in ways such as their failure to include propylene glycol in their list of ingredients. NMR test report (Exhibit I to Plaintiffs' Response to Defendants' Motion for Summary Judgment). These violations go beyond mere breaches of contract. They are practices expressly prohibited by statute because they have a tendency to induce consumers to purchase Defendants' mislabeled Products instead of competitors' accurately labeled products. Such claims are actionable under consumer fraud laws at issue. *E.g., Gubala,* 2016 WL 1019794 at *55 (finding product label misleading beyond express representation). Defendants are also liable for consumer fraud because they have introduced misbranded products into the stream of commerce in violation of 21 U.S.C.S. § 362(a).

The very purpose of labeling requirements is to prohibit commerce in misbranded articles and to inform and protect consumers. *United States v. Kocmond*, 200 F.2d 370, 374 (7th Cir. 1952). In short, Plaintiffs' consumer protection claims are proper and distinct from any warranty claims. *Suchanek*, 764 F.3d. at 755 (reversing district court's denial of class certification under virtually identical Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee consumer fraud acts).

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in *Suchanek*, Defendants' Motion for Summary Judgment should be denied.

Dated:  July 3, 2018                              Respectfully submitted,

*/s/ Jason J. Thompson*
Jason J. Thompson
**SOMMERS SCHWARTZ, P.C.**
One Towne Square, 17th Floor
Southfield, MI  48076
(248) 355-0300
jthompson@sommerspc.com

Nick Suciu III
**BARBAT, MANSOUR & SUCIU PLLC**
1644 Bracken Rd.
Bloomfield Hills, MI  48302
(313) 303-3472
nicksuciu@bmslawyers.com

Katrina Carroll
Kyle A. Shamberg
**LITE DePALMA GREENBERG, LLC**
212 West Hacker Drive, Suite 500
Chicago, IL  60606
312-750-1265
kcarroll@litedepalma.com
kshamberg@litedepalma.com

Rachel Soffin
**MORGAN & MORGAN**
Complex Litigation Group
201 North Franklin Street
7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402
RSoffin@ForThePeople.com

Gregory F. Coleman
**GREG COLEMAN LAW, P.C.**
First Tennessee Plaza
800 S. Gay Street
Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0090
Facsimile: (865) 522-0049
greg@gregcoleman.law

        Jonathan N. Shub CSB #237708
        **KOHN, SWIFT & GRAF, P.C.**
        One South Broad Street
        Suite 2100
        Philadelphia, PA 19107
        (215) 238-1700
        jshub@kohnswift.com

        *Attorneys for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that the foregoing was electronically filed with the United States District Court for the Northern District of Illinois on July 3, 2018, using the Court's CM/ECF System, which served notice of the filing upon all counsel of record.

        */s/ Jason J. Thompson*
        Jason J. Thompson