IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER BEARDSALL, *et al.*, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 16 C 6103 |
| CVS PHARMACY, INC.; TARGET CORPORATION; WALGREEN CO.; WAL-MART STORES, INC.; and FRUIT OF THE EARTH, INC., | ) ) ) ) ) ) | Judge Joan H. Lefkow |
| Defendants. | ) | |

## **OPINION AND ORDER**

Jennifer Beardsall, individually and on behalf of all others similarly situated, filed suit against CVS Pharmacy, Inc.; Target Corporation; Walgreen Co.; Wal-Mart Stores, Inc.; and Fruit of the Earth, Inc. (FOTE), alleging state-law consumer protection violations for misleading labels on several aloe gels manufactured by FOTE and sold by the other defendants. (Dkt. 90.) The parties agreed to pursue a bellwether process and complete discovery only with respect to two products: (1) FOTE's Aloe Vera 100% Gel (FOTE Gel), and (2) Well at Walgreens Aloe Vera Body Gel (Walgreens Gel). (*See* dkt. 111.) The court entered the parties' proposed bellwether schedule and bifurcated discovery on July 11, 2017. (Dkt. 112.) Defendants FOTE and Walgreens (collectively, Defendants) now move to for summary judgment. (Dkt. 171.) For the reasons stated below, Defendants' motion for summary judgment is granted.

## BACKGROUND

FOTE produces private-label aloe gel for defendant Walgreens. (Dkt. 200 at 2 n.2.; *see also* dkt. 209, Defendants' Response to Plaintiffs' Statement of Additional Facts (Def. Resp.) ¶ 109). FOTE also sells its own brand of aloe gel. (*Id.*) These products are nearly identical except for the wording on their labels. (*Id.*) Manufacturing of the gels begins with the harvest of leaves from aloe barbadensis plants by farms located in El Progreso, Guatemala. (Dkt. 190, Plaintiffs' Response to Defendants' Local Rule 56.1 Statement of Material Facts (Pl. Resp.) ¶¶ 40–41.) Vegetal Extracts, Inc. purchases the leaves, which are brought to their facility in El Progreso. (*Id.* ¶¶ 39–40.) The leaves are then processed and made into an aloe vera concentrate before being shipped to Concentrated Aloe Corporation (CAC) (FOTE's aloe supplier) in Florida and subsequently to FOTE in Texas.[1] (*Id.*)

Processing at Vegetal Extract's facility includes several steps. First, the leaves are washed and hand-filleted to remove the outer green rind and extract the internal aloe gel filets. (*Id.* ¶ 41.) These filets are then run through a grinder and de-pulped, much like orange juice is de-pulped during processing. (*Id.*) Defendants maintain that an enzyme called cellulase is added to create a consistent material and that the aloe is then pasteurized to eliminate bacteria, which prevents it from rotting and molding in the finished product. (*Id.*) Next, the aloe is decolorized through a filtering process that removes impurities such as dirt from the plant, remnants from the rind, and a potentially carcinogenic compound called aloin. (*Id.*) Finally, water is removed from the aloe to lower shipping costs and a preservative is added to ensure the aloe does not degrade or become contaminated during transport. (*Id.*)

---

[1] Vegetal Extracts and CAC are owned by Timothy Meadows, who provided a declaration in this case. (*See* dkt. 178 ¶ 1.)

Before being shipped to Florida, the aloe is subjected to a quality control inspection and a microbial analysis and must pass such inspections on factors including appearance, color grades, odor, solid levels, pH values, and microbial levels. (*Id.*) The aloe concentrate is then sealed in drums and shipped to CAC. (*Id.*) On arrival in Florida, a quality assurance manager again tests the aloe. (*Id.*) CAC also performs infrared analysis to ensure that other substances were not substituted for aloe during shipment. (*Id.*) Lastly, CAC adds a preservative and re-pasteurizes the aloe before shipping it to FOTE in Texas. (*Id.*)

On arrival at FOTE, a CAC employee stationed in Texas inspects the shipment to ensure it has maintained its integrity in transit before releasing it to FOTE. (*Id.*) Purified water is then added to the aloe concentrate to reconstitute the product. (*Id.*) Finally, the aloe is mixed with stabilizers and preservatives and then bottled. (*Id.* ¶ 42.) FOTE maintains "batch records," which lay out the formula and manufacturing steps for each batch of the finished cosmetic product and contain signatures of the individuals who were involved in the steps completed at FOTE. (*Id.* ¶ 44.) The finished products contain approximately 98% aloe gel, which itself is 99% water, and 2% other ingredients including thickeners. (Def. Resp. ¶ 78.)

Once the product is bottled, labels are affixed to the outside of the bottles. FOTE's product label states "Fruit of the Earth Aloe Vera 100% Gel*" on the front, and the asterisk after "Gel*" leads to the following on the back of the bottle: "Plus stabilizers and preservatives to insure potency and efficacy." (Pl. Resp. ¶ 50; dkt. 179-5.) The front of the bottle also reads: "PURE. No Color Added. Moisturizing Therapy for Sunburn • Dry, Irritated Skin." (Dkt. 179-5.) The back label states: "100% PURE ALOE VERA GEL*" and includes a list of ingredients, with "aloe vera gel" listed first. (*Id.*) It also contains a description of the product which states, "Cooling soothing gel from nature's miracle plant of the ages. Made from fresh Aloe Vera

3

leaves. Forms a protective barrier which helps retain moisture and promotes healing. Non-Oily Moisturizer provides effective relief from Sunburn, Minor Burns, Skin Irritations, Insect Bites, Chafing, Itching, Dry Skin." (*Id.*) The bottle also invites consumers to "Discover the many uses of aloe! TRY IT! •as a shaving gel •as a hair styling gel • on blemishes." The front and back labels of the FOTE Gel can be seen below.



(*Id.*)

The heading on the front of Walgreens's product label reads: "Alcohol Free Aloe Vera Body Gel." (Dkt. 179-6.) The back label contains a list of ingredients, with Aloe Barbadensis Leaf Juice as the first ingredient, and a product description that states, "Walgreens Aloe Vera

Body Gel provides powerful relief for dry, irritated or sunburned skin. This refreshing gel helps skin retain natural moisture to promote healing by forming a protective barrier over injured skin. This non[-]oily formula absorbs quickly and helps relieve minor burns, insect bites, chafing and itching." (Pl. Resp. ¶ 51; Dkt. 179-6.) The front and back labels of the Walgreens Gel can be seen below.




(Dkt. 179-6.)

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories,

5

admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). In response, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Day* v. *N. Ind. Pub. Serv. Co.*, 987 F. Supp. 1105, 1109 (N.D. Ind. 1997); *see also Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## ANALYSIS

### I. Consumer Protection Law[2]

Plaintiffs bring claims under various state consumer protection statutes.[3] The parties agree that, while differing in certain respects, all statutes at issue here require the plaintiffs to

---

[2] Defendants argue that plaintiffs' claims are really breach of express warranty claims because plaintiffs have not alleged deception to support their consumer protection claims. (Dkt. 172 at 15.) *See Greenberger* v. *GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) ("When allegations of consumer fraud arise in a contractual setting, the plaintiff must prove that the defendant engaged in deceptive acts or practices distinct from any underlying breach of contract."); *see also Gubala* v. *CVS Pharm., Inc.*, No. 14 C 9039, 2016 WL 1019794, at *17 (N.D. Ill. Mar. 15, 2016) (distinguishing between breach of contract cases and consumer fraud cases and finding that plaintiff stated claim under ICFA notwithstanding pleading existence of contractual relationship). But plaintiffs' second amended complaint alleges that Defendants misled consumers about the ingredients and effectiveness of the products at issue, and explicitly alleges deception. (*See, e.g.*, dkt. 90 ¶ 13 ("The Products' labels are false, deceptive, and misleading in violation of . . . almost every state . . . consumer protection . . . law in the United States."); *id.* ¶ 120 ("Defendants developed and knowingly employed this marketing strategy to deceive consumers."). In other words, the second amended complaint alleges deception separate and apart from any alleged contractual relationship. Further, the cases Defendants cite brought both breach of warranty and consumer protection claims. Plaintiffs bring only consumer protection claims here.

[3] These claims include: Count I: California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et. seq* (CLRA) (against FOTE, CVS, Target, and Walgreens); Count II: California False

show that the relevant labels are likely to deceive a reasonable consumer. (*See* dkt. 172 at 3 (Defendants asserting that "[w]hile consumer protection laws vary from state to state," the "fundamental requirement" that "[p]laintiffs bear the burden of establishing that the labels on [the defendant's] products are deceptive . . . applies to the claims of each [p]laintiff, regardless of which state's law applies"); dkt. 205 at 15 (plaintiffs stating that "the predominant question in these cases is whether the defendant's labeling is deceptive")).[4] As such, for purposes of state

---

Advertising Law, Cal. Bus. & Prof. Code § 17500 *et. seq* (FAL) (against FOTE, CVS, Target, and Walgreens); Count III: California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et. seq* (UCL) (against FOTE, CVS, Target and Walgreens); Count IV: Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et. seq* (FDUTPA) (against CVS, FOTE, and Walgreens); Count V: Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 *et. seq* (ICFA) (against FOTE, CVS, Walgreens, and Wal-Mart); Count VI: Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901 *et seq.* (MCPA) (against FOTE and CVS); Count VII: Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.* (MMPA) (against FOTE and CVS); Count VIII: New Hampshire Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat § 358-A:1 *et seq.* (NHCPA) (against CVS); Count IX: New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1 *et. seq* (NJCFA) (against CVS); Count X: New York General Business Law § 349 *et. seq* (NYGBL) (against FOTE, CVS, and Walgreens); Count XI: North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et. seq* (NCDTPA) (against FOTE); Count XII: Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 *et seq.* (OCSPA) (against FOTE); Count XIII: Oregon Unlawful Trade Practices Act, ORS § 646.605 *et. seq* (OUTPA) (against FOTE); Count XIV: Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code § 17.41 *et. seq* (DTPA) (against FOTE).

[4] *See also, e.g.*, *Williams* v. *Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) ("Appellants' claims under [the CLRA, FAL, and UCL] are governed by the 'reasonable consumer' test."); *Suchanek* v. *Sturm Foods, Inc.*, 764 F.3d 750, 755, 761–62 (7th Cir. 2014) (finding "proof that a statement is likely to mislead a reasonable consumer, even if the statement is literally true" was applicable to all state consumer protection laws at issue, which included, among others, California, Illinois, New Jersey, New York, and North Carolina); *Zlotnick* v. *Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) ("[D]eception [under the FDUTPA] occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances."); *Dix* v. *Am. Bankers Life Assur. Co. of Fla.*, 415 N.W. 2d 206, 209, 429 Mich. 410 (Mich. 1987) (exploring an MCPA claim and inquiring whether "a reasonable person would have relied on" the allegedly deceptive representations); *Thornton* v. *Pinnacle Foods Grp. LLC*, No. 4:16-CV-00158 JAR, 2016 WL 4073713, at *3 (E.D. Mo. Aug. 1, 2016) (asking whether "a reasonable consumer would be deceived by a product label" when looking at an MMPA claim); *Rikos* v. *Procter & Gamble Co.*, 799 F.3d 497, 507 (6th Cir. 2015) (finding that "[t]he false-advertising laws at issue punish companies that sell products using advertising that misleads the reasonable consumer," when analyzing California, Illinois, Florida, New Hampshire, and North Carolina laws); *Andriesian* v. *Cosmetic Dermatology, Inc.*, No. 3:14-cv-01600, 2015 WL 1638729, *3 (D. Or. Mar. 3, 2015) ("To state a false labeling or advertising claim under each theory, plaintiff must affirmatively plead and prove that the statements at issue are either objectively false or at least likely to mislead a reasonable consumer."); *Briseno* v. *ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017)

consumer protection statutes, "a statement is deceptive if it creates a likelihood of deception or has the capacity to deceive." *Bober* v. *Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001). "This requires more than a mere possibility that [a] label might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the reasonable consumer standard requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Ebner* v. *Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (internal citations omitted).

Further, context is important. "Where a plaintiff contends that certain aspects of a product's packaging are misleading in isolation, but an ingredient label or other disclaimer would dispel any confusion, the crucial issue is whether the misleading content is ambiguous; if so, context can cure the ambiguity and defeat the claim, but if not, then context will not cure the deception and the claim may proceed." *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 275 F. Supp. 3d 910, 922–23 (N.D. Ill. 2017)[5] (*comparing, e.g.*, *Williams* v. *Gerber Prods. Co.*, 552 F. 3d 934, 939–40 (9th Cir. 2008) (concluding reasonable consumer could plausibly be deceived where pictures of fruits were prominently featured on "fruit juice snacks" but neither the fruits nor their juices were in the product, even though ingredient list was accurate), *with McKinnis* v. *Kellogg USA*, No. CV 07-2611 ABC (RCx), 2007 WL 4766060, at *3–5 (C.D. Cal. Sept. 19, 2007) (finding that reasonable consumer would check the ingredient list for actual fruit in "Froot Loops" cereal, where product included the "fanciful" word "F-R-O-O-T" in its name, "brightly colored ring-shaped cereal resembling fruit," and "illustrations of

---

(affirming multistate class certification under California, Florida, Illinois, New York, Ohio, Oregon, and Texas consumer protection statutes, among others).

[5] In *In re 100% Grated Parmesan Cheese*, the court found that a label stating "100% Grated Parmesan Cheese" was not misleading because the "readily accessible ingredient panels on the products [] disclose[d] the presence of non-cheese ingredients." *Id.* at 923.

8

fruit surrounding [a] banner stating 'NATURAL FRUIT FLAVORS,'" but no specific affirmation that product contained fruit)); *see also Solak* v. *Hain Celestial Grp., Inc.*, No. 3:17-CV-0704 (LEK/DEP), 2018 WL 1870474, at *5 (N.D.N.Y. Apr. 17, 2018) (adopting rule expounded in *In re 100% Parmesan Cheese* under New York and California law); *Davis* v. *Hain Celestial Grp., Inc.*, 297 F. Supp. 3d 327, 334 (E.D.N.Y. 2018) (same under New York law).

## II.     Merits of the Case

Although their theory of the case has shifted several times,[6] plaintiffs now contend that the FOTE Gel label is misleading in two ways: (1) by claiming that its product is "100%" and "Pure;" and (2) by asserting that the product "provides effective relief from [s]unburn." Since the Walgreens Gel label does not use the term 100%, plaintiffs assert only that the Walgreens label is misleading because it states that the product "provides powerful relief for . . . sunburned skin."

### A.     FOTE Label: "100%" and "Pure"

The descriptions "Aloe Vera 100% Gel*" (on the front of the FOTE bottle) and "100% Pure Aloe Vera Gel*" (on the back of the FOTE bottle) are ambiguous. These phrases might be interpreted as saying that the product is 100% aloe vera and nothing else. But the front label might also be interpreted as a statement that the product is 100% gel, since that is literally what the words say. And the back label might also be a statement that the product is 100% pure, meaning that the product is "fragrance free" and has "no color added," given that these phrases

---

[6] Plaintiffs' second amended complaint alleges that the finished FOTE Gel and Walgreens Gel "contain[] no detectible amount of Aloe vera at all." (Dkt. 90 ¶¶ 4, 7.) But in their motion for class certification, plaintiffs now claim that the products contain "barely detectable amounts" of aloe. (Dkt. 157 at 1.) This is because over the course of this litigation, plaintiffs' expert—Dr. John Edwards—determined that the method he was using to test the relevant products did not work on finished aloe products with thickeners like those at issue here. After modifying his method so it could be used to test thickened aloe products, Dr. Edwards revised his initial conclusion that the marker for aloe was "not observed," and instead concluded that this marker was in fact present in the FOTE samples he tested using this new method.

9

directly follow the 100% declaration, or perhaps that the product has no additives or chemicals. Given these ambiguities, reasonable consumers would need more information before concluding that the products contain only aloe vera. The FOTE bottle actually directs consumers to further explore the meaning of the phrases "Aloe Vera 100% Gel*" and "100% Pure Aloe Vera Gel*" by including an asterisk (*) after the word "Gel" in both cases. The asterisk leads the consumer to fine print on the back of the bottle, which states, "Plus stabilizers and preservatives to insure potency and efficacy." And directly above the fine print is an ingredient list, which lists aloe vera gel followed by six other ingredients.

Such additional information—which the FOTE bottle implores the consumer to examine—dispels any notion that the product contains only aloe vera. *See Williams*, 552 F.3d at 939–40 ("[R]easonable consumers expect that the ingredient list contains more detailed information about the product."); *In re 100% Grated Parmesan Cheese*, 275 F. Supp. 3d at 923 ("Reasonable consumers would thus need more information before concluding that the labels promised only cheese and nothing more, and they would know exactly where to look to investigate—the ingredient list."). Indeed, although some plaintiffs expressed confusion relating to the label at various points during their depositions,[7] plaintiffs admit that "the presence of preservatives—in relatively small amounts—was acceptable and something they *expected*." (Dkt. 200 at 14) (emphasis in original); *see also id.* at 7 ("No [p]laintiff took the label to mean

---

[7] (*See, e.g.*, Def. Resp. ¶ 83 (plaintiff Groffsky testifying that "[b]ecause on the very front it says '100 percent gel' and – it says 'Aloe' – like 'Aloe vera 100 percent gel.' And with that I assumed . . . that it contained 100 percent aloe vera"); *Id.* ¶ 87 (plaintiff Reeves testifying that "[b]ecause you're believing that this is a hundred percent gel in a gel form – a hundred percent aloe vera in a gel form. It's misleading. . . . That's what I believed, that it had a hundred percent aloe vera in a gel form when I bought it."); *Id.* ¶ 95 (plaintiff Draus concluding that in his interpretation, the words "100% gel" right under the words "aloe vera" is misleading)).

that there was absolutely nothing other than aloe vera in the bottle."). Thus, when the labeling is viewed as a whole, the terms "100%" and "Pure" do not make the FOTE label deceptive.

Plaintiffs also maintain that the words "100%" and "Pure" are misleading for a different reason. The parties agree that the products contain approximately 98% aloe gel (which itself is 99% water) and 2% other ingredients including thickeners.[8] (Def. Resp. ¶ 78.) But plaintiffs contend that the FOTE label is misleading because there is not enough aloe in that 98%. Specifically, plaintiffs argue that even if some harvested aloe was used to manufacture the products, the manufacturing process filtered out or removed virtually all of the compound that makes aloe unique—acemannan, a chemical compound and complex polysaccharide found only in aloe leaves. Thus, plaintiffs argue that although they never expected aloe squeezed from a plant directly into a bottle, they also did not expect that a product labeled "Aloe Vera 100% Gel*" would have little to no aloe at all.

In support, plaintiffs present test results from their expert, Dr. John Edwards, who uses a method called nuclear magnetic resonance (NMR) spectroscopy testing to determine the presence and quantity of aloe vera by looking at a peak in the NMR spectrum representing the presence of acemannan.[9] (Dkt. 190-4 at 47 ¶ 11.) According to Dr. Edwards, for products containing a 1x concentration of aloe vera, he expects to see a 200–500 mg/L concentration of

---

[8] In one sentence in their response, plaintiffs claim that listing "aloe vera gel" as the first/predominant ingredient is extremely misleading. (Dkt. 200 at 9.) But plaintiffs conceded that the products contain approximately 98% aloe gel and 2% other ingredients. Aloe gel is therefore the predominant ingredient. That aloe gel is made up of 99% water does not mean the products must list water as the predominant ingredient; water is simply a large component of aloe gel, as plaintiffs also admit.

[9] In conjunction with this motion for summary judgment, the court denies in a separate order Defendants' motion to exclude the expert opinions and testimony of plaintiffs' proffered expert John Edwards. Dr. Edwards's opinions and testimony are thus admitted for purposes of deciding the present motion for summary judgment.

acemannan, as calculated from the NRM spectrum. (*Id.* at 48 ¶¶ 16, 22; *id.* at 7, 17.) In the present case, Dr. Edwards tested two FOTE Gel samples, one purchased in April 2016 and the other in August 2017, and found 45 mg/L and 65 mg/L of acemannan, respectively, which equates to an aloe content of approximately 0.1-0.2x. (*Id.* at 18.) Based on these results, plaintiffs conclude that there is little to no aloe present in the FOTE Gel.

But there is no evidence that a certain amount of acemannan must be present in the finished product for it to be aloe. Indeed, the International Aloe Science Council (IASC)—a not-for-profit industry organization that provides guidelines and concentration limits of acemannan in aloe vera to help determine the quality of aloe vera material—maintains that for it to certify a finished product, acemannan need only be "[p]resent."[10] (Dkt. 180-8 at 25; dkt. 190-4 at 48 ¶ 14.) Further, the American Herbal Pharmacopoeia has written that "[t]he reported concentrations of polysaccharides in aloe vera leaf juices vary widely. These variations can be due to the different processes used in juice manufacturing, seasonal changes, differences of geographical location, and variations in extraction and processing methods." (Dkt. 180-18 at 23 (internal citations removed).) Although Dr. Edwards maintains that even with these variations, the acemannan concentration should be between 200–500 mg/L, (dkt. 190-4 at 7), he does not opine that anything below a 1x aloe concentration is not actually aloe. Further, a "review of a limited number of commercial aloe vera 'gel'[11] products suggests that polysaccharide concentration

---

[10] Plaintiffs' repeated reference to 5% acemannan by dry weight is for raw aloe materials, not finished products like those at issue here. (*See* dkt. 180-8 at 25.) Plaintiffs' reliance on test results of raw aloe material and references to acemannan concentration in products not specifically at issue here are similarly inapposite.

[11] Although "aloe juice" and "aloe gel" are sometimes used interchangeably (*see, e.g.*, dkt. 210-6 at 7), the use of quotes around the word "gel" and the context of the sentence in this publication, which uses the term "aloe vera inner leaf juice" or "juice" when referring to the substance in a non-finished

varies widely, with a large percentage of products containing lower than 10% acetylated polysaccharides [i.e. acemannan] and some containing as low as 1%." (*Id.* at 46.)

At best, plaintiffs argue that the products at issue are not good quality aloe. Defendants' expert Ronald Pelley has written that "'[o]ver-processing' . . . generally lowers [the] polysaccharide" percentage, and that "these 'over processed' materials are not good quality aloe." (Dkt. 180-17 at 32.) He also states, however, that "[t]his does not mean that these materials are not legally, 'authentic' aloe. They have not been adulterated or diluted." (*Id.*) Thus, there does not appear to be a point at which a low amount of acemannan means that the product is no longer aloe. Nor is there any evidence that the aloe in the products at issue has somehow been adulterated, diluted, or otherwise changed such that it is anything other than the aloe it claims to be. In other words, there is no evidence that calls into question the purity of the aloe in the FOTE Gel. Nor is there any expert testimony setting forth the theory that the products at issue are actually low quality.[12] The words "Pure" and "100%" are thus not misleading even under this interpretation of plaintiffs' allegations.

Plaintiffs' reliance on *Suchanek* v. *Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014), does not change the analysis. In that case, the plaintiffs brought a class action complaining that the defendant marketed its coffee pods in a misleading fashion to deceive consumers into thinking that the pods were like a competitor's high-quality pods when its pods actually contained almost exclusively undesirable instant coffee. On appeal, the Seventh Circuit reversed a grant of

---

product, indicates that this reference to commercial aloe gel refers to the types of finished gel products at issue in the present case.

[12] Although Dr. Edwards found what he believes to be a low amount of acemannan in the FOTE Gel samples he tested, he did not opine that this means the product is low quality. Plaintiffs thus present no expert opinion about the quality of the aloe in the FOTE Gel samples at issue or how a consumer would in turn be deceived.

13

summary judgment, finding that the district court erroneously "appear[ed] to assume that a package cannot be misleading if it does not contain literal falsehoods," and that a jury should have decided the question of whether the packaging was likely to mislead a reasonable consumer. *Id.* at 761–62. But there was no debate in *Suchanek* about the quality of the coffee in defendants' pods. The coffee was unequivocally of inferior quality and being marketed as high quality, which thus had the potential to mislead consumers. The court found that,

> [Defendant] consciously avoided use of the term "instant" and designed the package to resemble Keurig products; several of the plaintiffs testified that they were misled; the packaging contained numerous statements that implied the product was premium fresh (*i.e.* unbrewed) coffee; and the package did not explain that it was little more than instant coffee. At least three independent expert surveys, all employing different methodologies, found that consumers were confused about the product.

*Id.* at 762. Here, there is no evidence that the aloe in Defendants' products is anything other than aloe. Indeed, there is no scientific cutoff for when a product ceases to be aloe, and there is no mandatory government standard for the chemical composition of aloe in cosmetic products. There is no expert testimony to create an issue of material fact that the aloe in Defendants' products is actually low quality. There were no surveys done. The labels do not expressly reference quality. And no consumers complained directly about "quality."[13]

In sum, had the theory plaintiffs expounded in their complaint (that the finished FOTE Gel and Walgreens Gel "contain[ed] no detectible amount of Aloe vera at all") been consistent with what the parties uncovered during discovery, this would likely be a very different case. Under the facts before the court, however, the FOTE Gel labeling is not deceptive.

---

[13] This is differentiated from efficacy, which is addressed further below.

### B. FOTE and Walgreens Labels: Therapeutic Relief from Sunburn

Plaintiffs also maintain that Defendants' labels are misleading because they state that the products provide relief from sunburn, but with low amounts of acemannan the products do not produce the therapeutic benefit they purport to provide. There is, however, no expert testimony about the necessary compounds for sunburn relief and certainly no evidence to establish that a certain amount of acemannan is needed to provide such relief. There is also no evidence that the products were tested as they relate to sunburn relief and shown to provide no such relief. And there are no customer complaints indicating that a consumer was somehow deceived by the product labels as it relates to sunburn relief.[14] To the contrary, several plaintiffs testified that the product did what they expected it to do. (*See, e.g.*, Def. Resp. ¶ 80.)

In defense of their argument, plaintiffs again fall back on their original theory of the case. For example, plaintiffs assert that "a jury may accept the testimony and work of [d]efendants' expert, as well as that of other respected researchers including the IASC and [the Aloe Research Foundation], who all conclude that without [a]cemannan these products have *little if any therapeutic value*." (Dkt. 200 at 12 (emphasis in original)). But this assertion is based on a false premise—that there is *no acemannan* in Defendants' products. Plaintiffs also rely on faulty assumptions drawn from Defendants' expert's testimony. Mr. Pelley testified, for example, that commercial processing can alter or degrade aloe to the point where it no longer has any

---

[14] There appears to be one complaint related to sunburn relief for a product which may or may not be at issue in the case. *See* Def. Resp. ¶ 96; dkt. 180-5 at 83:1–9, 85:12–17, 86:13–18 (plaintiff Judge describing a "bad" sunburn and stating that the product "didn't do what it was supposed to do," which was "to moisturize me and help heal my sunburn," but also stating that "[w]hen I put it on, it was cool"); *see also* dkt. 197 at 6 n.4 (Defendants asserting that the product plaintiff Judge bought was not made by FOTE and is thus not at issue here). But "the reasonable consumer standard requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Ebner*, 838 F.3d at 965. One stray complaint about a particularly severe sunburn does not meet the reasonable consumer standard.

therapeutic benefits. (*See* dkt. 157-7 at 117:16–122:20.) But there is no evidence that Defendants' products have reached that point. Indeed, Dr. Pelley testified that aloe quality is degraded "when the polysaccharides are completely broken down" (*id.* at 121:9–16), which, although consistent with plaintiffs' initial theory, is not the case here. Plaintiffs also contend that Dr. Pelley conceded he would not use the products at issue to treat sunburn. Dr. Pelley actually testified that adding water to dilute the original aloe concentration results in adulterated aloe but went on to state that "of course, you didn't observe that in Guatemala." (*Id.* at 126:8–127:6.) He has also written that even where aloe has been over processed, it does not mean that it is not "authentic aloe" or that it has been "adulterated or diluted." (*See* dkt. 180-17 at 32.)

Had plaintiffs offered an expert to opine on the efficacy of the products as it relates to sunburn or otherwise demonstrated that the products do not provide relief from sunburn, perhaps the result would be different. As that evidence is not before the court, no reasonable consumer would be deceived by product labels claiming to provide sunburn relief when there is no evidence that the products do not in fact provide such relief.

## CONCLUSION AND ORDER

For the foregoing reasons, Defendants' motion for summary judgment (dkt. 171) is granted. Plaintiffs' motion for class certification (dkt. 157) and Defendants' motion to exclude expert testimony of Steven Gaskin and Colin Weir (dkt. 166) are denied as moot. A status hearing is set for April 3, 2019 at 9:30 am.

Date: March 13, 2019

_____
U.S. District Judge Joan H. Lefkow

16